UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| i3Archive, Inc. and | : | |
| National Digital Medical Archive, Inc. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 2:06 - CV - 04286 - MAM |
| | : | |
| InSite One, Inc. | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

## PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  INSITE ONE HAS MISAPPLIED THE LAW ..................................................... 2

   A.  *Phillips* overview ........................................................................................... 2

III.  PERSON OF ORDINARY SKILL IN THE ART ................................................ 4

IV.  INSITE ONE'S PROPOSED CLAIM CONSTRUCTIONS ARE NOT SUPPORTABLE .. 4

   A.  Central Database ........................................................................................... 4

   B.  Institution Database ...................................................................................... 9

   C.  Institution Server .......................................................................................... 13

   D.  Proxy Database .............................................................................................. 18

   E.  Warehouse Database ..................................................................................... 19

   F.  Warehouse Server .......................................................................................... 21

V.  TERMS INSITE ONE DID NOT DEFINE ......................................................... 21

VI.  CONCLUSION ..................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196 (Fed. Cir. 2007) ........................................... 8

*AbTox Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997),
    *modified on other grounds*, 131 F.3d 1009 (Fed. Cir. 1997) ................................................... 16

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*,
    224 F.3d 1308 (Fed. Cir. 2000) ........................................................................................ 12

*Chef America, Inc. v. Lamb-Western, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) .................................. 1

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005),
    *cert. denied*, 546 U.S. 1157 (2006) .................................................................................... 18

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*),
    *cert. denied*, 546 U.S. 1170 (2006) ............................................................................ passim

*Power Mosfet Tech., L.L.C. v. Siemens AG, Infineon Tech. Corp.*,
    378 F.3d 1396 (Fed. Cir. 2004) ........................................................................................ 12

*Scanner Tech. Corp. v. ICOS Vision Sys. Corp. N.V.*, 365 F.3d 1299 (Fed. Cir. 2004) .............. 16

*SciMed Life Sys., Inc. v. Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) ................... 3

*Sinorgchem Co., Shandong v. ITC*, 2007 U.S. App. Lexis 30348 (Fed. Cir. 2007) ...................... 8

*Snow v. Lake Shore & Mich. S. Ry. Co.*, 121 U.S. 617 (1887) ..................................................... 4

*Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355 (Fed. Cir. 2003) ................................................ 13

*Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ....................... 2, 7

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .......................................... 3

**Statutes**

35 U.S.C. § 112 ................................................................................................................... 10

**Other Authorities**

*Computer Dictionary*, (Microsoft Press, 3rd Ed. 1997) ............................................................. 19

*Computer Dictionary*, (Microsoft Press, 4th Ed. 1999) ......................................................... 19, 20

## I.   INTRODUCTION

InSite One's proposed claim constructions are an attempt to salvage poorly drafted claims from a poorly drafted patent. The '742 Patent and its claims were not drafted to encompass the broad constructions that InSite One's opening claim construction brief proposes. InSite One can not change the content of the patent or the coverage of the claims through the claim construction process. Courts must "construe the claim as written, not as the patentees wish they had written it." *Chef America, Inc. v. Lamb-Western, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

InSite One spends much of its argument attacking i3Archive's proposed constructions as reading limitations from the specification into the claims. Its argument ignores a fundamental aspect of claim construction: looking to the intrinsic evidence (the '742 Patent and its file history) for the meaning of claim terms. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*), *cert. denied*, 546 U.S. 1170 (2006).

Far from improperly reading limitations from the specification into the claims, i3Archive has properly interpreted claim terms *in light of* the specification and the meaning that the inventors gave to those terms, as required by *Phillips*. The fallacy in InSite One's argument is best shown by the fact that InSite One took parts of its <u>own</u> proposed claim constructions from the specification based upon its acknowledgement that "it is appropriate to limit the claims based on the specification." (InSite One Br. at p.4). InSite One's application of the facts and legal principles one way for itself and differently for i3Archive must fail for the reasons explained below.

i3Archive's present response brief addresses InSite One's blurring of facts and its mistaken application of the law to the facts for the six claim terms for which InSite One provided proposed claim constructions. For the reasons set forth in its currently pending motion to preclude, InSite One should be precluded from providing proposed claim constructions for any other claim terms.

## II.    INSITE ONE HAS MISAPPLIED THE LAW

### A.    *Phillips* overview

The ultimate claim constructions resulting from the claim construction process have a significant bearing on the outcome of a patent infringement lawsuit.  In many instances, claim constructions effectively decide the case.  The Federal Circuit in the seminal claim construction case, *Phillips v. AWH Corp, supra,* disapproved of favoring dictionaries (extrinsic evidence) over the specification (part of the intrinsic evidence) that had been applied in  some decisions such as *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed. Cir. 2002). *Phillips,* instead, established the specification as the primary tool for claim construction and lowered dictionaries to a fourth tier status behind the claims, the specification and the prosecution history. 415 F.3d at 1315, 1318-1319.

i3Archive's opening brief described the claim construction process set forth in *Phillips* and the importance of looking to the intrinsic evidence when construing claim terms (i3Archive Br. at pp.  14-17) and then applied this process in its claim construction analysis.  Like the cases overruled by *Phillips,* however, InSite One gives little weight to the specification in attacking i3Archive's proposed claim constructions, ignoring *Phillips'* paramount requirement that the claims "must be read in view of the specification…it is the single best guide to the meaning of a disputed term." *Phillips,* 415 F.3d at 1318-1319.

The focus of InSite One's argument against i3Archive's proposed constructions is that "i3Archive repeatedly attempts to import limitations from preferred embodiments into the asserted claims," calling it a "cardinal sin of claim construction."[1]  (InSite One Br. at p. 2, 3).

---

[1] The "cardinal sin" reference arose from SciMed's *attorney's* argument in *SciMed Life Sys., Inc. v. Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1340 (Fed. Cir. 2001).  The court in *SciMed* actually *affirmed* the District Court's use of the specification to interpret claims and cited several cases in support for doing so.  *See SciMed,* 242 F.3d at 1341-1342, 1345.

This overly broad and simplistic sound bite, however, mischaracterizes not only i3Archive's proposed claim constructions, but also

- misapplies the *Phillips* case from which it attempts to draw support;
- mischaracterizes the factual bases for i3Archive's proposed claim constructions; and
- downplays the significance of the specification of InSite One's own patent.

The en banc *Phillips* decision made clear that the specification is critical to a proper interpretation of the claims. *Phillips*, 415 F.3d at 1319, 1321 *quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("the specification is the 'single best guide to the meaning of a disputed term...'"). InSite One attempts to constrain this Court's proper claim construction by taking *Phillips'* single "cardinal sin" dictum out of context. (InSite One Br. at p.3). In making this argument, InSite One ignores the fact that *Phillips* unambiguously endorsed the specification as critical and often dispositive evidence in the claim construction process. InSite One also fails to recognize that there is often a very narrow distinction between using the specification to interpret the meaning of the claim and improperly reading a limitation from the specification into the claim. *Phillips*, 415 F.3d at 1323. Ultimately, "[t]he manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent." *Phillips*, 415 F.3d at 1323, *citing Snow v. Lake Shore & Mich. S. Ry. Co.*, 121 U.S. 617, 630 (1887) ("it was clear from the specification that there was 'nothing in the context to indicate that the patentee contemplated any alternative' embodiment to the one presented.")

It is not surprising that InSite One argues that i3Archive is reading limitations into the claims from the specification. Interpreting the claim terms by using the specification as a guide makes clear the problems of the '742 Patent and its claims, resulting in claim constructions that InSite One does not want. i3Archive has stayed true to the *Phillips* analysis and argued for an

3

appropriate interpretation of the claim terms in view of the intrinsic evidence - the specification and file history.  i3Archive did not provide an improper reading of a limitation from the specification into the claims, but rather a proper interpretation of claim terms in view of the specification and the file history.

## III.  PERSON OF ORDINARY SKILL IN THE ART

i3Archive agrees in principal with parts of the definition of the person of ordinary skill in the art proposed by InSite One.  i3Archive is not in agreement that this person can be someone with less than a college education who has worked in some undefined capacity.  In addition, i3Archive contends that such a person would be required to have experience in the medical IT (Information Technology) industry with PACS (Picture Archiving and Communication Systems), not some undefined "other similar system."

Accordingly, a person of ordinary skill in the art at the time of filing of the '742 Patent on November 10, 2000 would have been someone with a Bachelor's degree or higher in computer science or other related scientific field or discipline, familiar with computer systems and networking.  In addition the person of ordinary skill in the art would have had one or more years' experience working with computer systems in or with the medical industry in information technology.  In particular, the person of ordinary skill would have experience with data and image storage systems and PACS.

## IV.  INSITE ONE'S PROPOSED CLAIM CONSTRUCTIONS ARE NOT SUPPORTABLE

### A.  Central Database

| i3Archive's Proposed Construction | InSite One's Proposed Construction |
|---|---|
| A storage device configured to operate as a long-term permanent archive that is remotely located from the healthcare institution server (as defined in Ref. No. 1). | A database that acts as a long term storage for records and a set of operations for searching the records or for other functions. |

4

InSite One accuses i3Archive of improperly reading a limitation from the written description into the claims for i3Archive's proposed claim construction of "central database." It is ironic, therefore, that InSite One's own proposed claim construction for "central database" not only uses language directly from the specification ("long term storage"), but also does so incompletely. InSite One then compounds its error by relying upon extrinsic evidence, a dictionary definition ("for records and a set of operations for searching the records or for other functions") for the remainder of its proposed construction of this claim term. The use of a dictionary (extrinsic evidence) in this manner is the type of claim construction approach that was rejected and relegated to fourth place status after the claims, the specification and the prosecution history in *Phillips*. The relationship among the specification, other intrinsic evidence, and extrinsic evidence was discussed in detail in *Phillips*:

> . . .the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term. 415 F.3d at 1315 (internal quotation marks and citations omitted).

> . . .[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history. 415 F.3d at 1315 (internal quotation marks and citations omitted).

> . . . [T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. . .[T]he inventor's intention, as expressed in the specification is regarded as dispositive. 415 F.3d at 1316 (internal quotation marks and citations omitted).

> [W]e have also authorized district courts to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including. . . dictionaries. . . However, while extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language. 415 F.3d at 1317 (internal quotation marks and citations omitted).

> We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms, for several reasons. First, extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning. Second, while claims are

construed as they would be understood by a hypothetical person of skill in the art, extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent. 415 F.3d at 1318.

Finally, undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents. 415 F.3d at 1318-1319 (internal quotation marks and citations omitted).

In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence. 415 F.3d at 1319.

In light of *Phillips'* indication of the very limited use of extrinsic evidence in claim construction, InSite One's request for the Court to primarily rely on an extrinsic dictionary definition over the specification, discussed in more detail below, must be rejected.

Putting aside for the moment, InSite One's use of the term "database" in the beginning of its proposed construction, the phrase "acts as a long term storage," is a fragment of the text taken directly from the specification:

- "The central database 12 is an array of optical disks or other storage devices configured to operate as a long-term *permanent* storage archive." (Col. 8:53-56) (emphasis added).

Without explaining why, InSite One modified the above-quoted specification phrase to read "acts as a long term storage." It changed the words "configured to operate" to "acts" and removed the term "permanent." These modifications expose InSite One's need to rely upon the specification in order to construe the claim term; a process that *Phillips* requires. This is the same claim construction technique it argues is improper and attacks i3Archive for using. They can not have it both ways. i3Archive viewed the same specification phrase in order to interpret this term. In contrast to InSite One, i3Archive included the term "permanent," as required by the Applicants. There is no justification for including "long term" and excluding "permanent" from the claim construction for "central database" and InSite One has not presented one.

6

Despite *Phillips'* rejection of the *Texas Digital* approach of relying primarily on dictionaries for claim construction, InSite One brings another phrase into its proposed claim construction directly from an extrinsic dictionary and asks the Court to give it primary weighting, superior to the specification.  InSite One does not explain why it is acceptable to use dictionary extrinsic evidence as primary claim interpretation evidence for **its** claim construction, but improper for **i3Archive** to use intrinsic evidence (the specification) as primary evidence for **i3Archive's** claim construction.  InSite One's primary reliance upon extrinsic dictionary definitions is contrary to *Phillips*.  Consistent with *Phillips*, this Court should, instead, rely upon the specification and adopt i3Archive's proposed construction which relies solely upon the specification.

InSite One's proposed use of an extrinsic definition of the term "database" is also improper because the '742 Patent does not describe or define the "central database" as a combination of two separate terms, "central" and "database," but rather as a physical device referred to as a single term - "central database:" (1) "The central database **is** an array of optical disks or other storage devices." (Col. 8:53-56) (emphasis added) and (2) "Central database 12 **is** one or more host rack mounted computer servers or warehouse servers 37…" (Col. 8:26-27) (emphasis added).

Case law dictates that these two explanations of "central database" are, in fact, definitions of the claim term:

> [T]he word "is," . . . a term used herein the specification, may signify that a patentee is serving is its own lexicographer. *Abbott Labs. v. Andrx Pharms., Inc.,* 473 F.3d 1196, 1210 (Fed. Cir. 2007).  As such, the patentee must be bound by the express definition.

*Sinorgchem Co., Shandong v. ITC*, 2007 U.S. App. Lexis 30348 at *11 (Fed. Cir. 2007).  "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Sinorgchem Co.*

at *16 (citation omitted).  Both definitions make clear that the central database is a piece of hardware.

The Applicants' definition of the term "central database" in the '742 Patent exemplifies why the *Phillips* court said the specification is the best guide to the meaning of a disputed claim term.  Using the dictionary definition for "database" (instead of the complete claim term "central database"), as argued by InSite One, would result in the prohibited:

> [c]hang[ing] the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents.

*Phillips*, 415 F.3d at 1319.  Using the dictionary definition would therefore improperly broaden the claim scope outside of that disclosed and defined by the Applicants.

InSite One contends that (1) its "construction of 'central database' is in accord with [its] definition of 'database,'" that is based upon the dictionary definition (InSite One Br. at p.14); and (2) "[t]he extrinsic evidence also rebuts i3Archive's proposed claim construction (InSite One Br. at p.15).  As shown above, these contentions are without merit and must be rejected because they directly contradict *Phillips*.  Extrinsic evidence can not rebut the Applicants' definition from the specification - the intrinsic evidence.

i3Archive's proposed construction also recites that the central database is remotely located from the healthcare institution server.  In FIGs. 1 and 5, the central database is illustrated as remote from, and not part of, the participant healthcare institution or the institution server/proxy server.  The Detailed Description describes central database 12 as being remote from healthcare participant institutions 14 and remote from each other

> The vertical line 25 between the central databases 12 represents communication links utilized to transfer digital data and images between the various **remotely located central databases 12**.  (Col. 7:23-26) (emphasis added).
>
> Referring again briefly to FIG. 1, the central database 12 can be comprised of one or more databases **located remotely** from each other, each acting as a redundant

8

> back-up database for the other for purposes of storing data and images for retrieval in case of disaster or destruction of the other database. (Col. 10:43-48) (emphasis added).

That the central databases must be remotely located is a requirement of the invention.

> The invention provides archiving and retrieval sessions with an **offsite digital network** where electronically protected digital images can be received "on demand" over the Internet, via a Virtual Private Network (VPN), or dedicated lines. (Col. 4:3-7) (emphasis added).

The '742 Patent contrasted the benefits of its purported invention against a traditional film storage model which uses onsite storage.

> Also, because of the physical nature of film, **storage facilities today must be located in close proximity to the hospital site**. Off-site and redundant storage of electronic media entails extra costs for personnel equipment and physical space. **The invention's digital warehouses**, RAID and DVD OR ITS EQUIVALENT systems design **provides fail-safe disaster recovery** and 24x7 monitoring **in case of loss or failure of onsite images**. (Col. 4:23-31) (emphasis added).

Thus, reading this claim term in view of the specification points to and supports i3Archive's proposed construction.

### B. Institution Database

| i3Archive's Proposed construction | InSite One's Proposed Construction |
|---|---|
| A storage device accessible directly by the institution server (as defined in Ref. No. 1 above) | A healthcare institution's database that contains records and a set of operations for searching the records or for other functions |

The difficulty in interpreting the term "institution database" is that it is not used anywhere in the Detailed Description of the specification. It is only used in the claims. The only analogous term that is used in the figures (not the Detailed Description) is "proxy database." i3Archive contends that the proxy database and the institution database are the same. If the

institution database is not the same as the proxy database, the '742 Patent would lack a written

description of "institution database" that complies with 35 U.S.C. § 112, first paragraph.[2]

InSite One's construction of "institution database" is improper for many of the same

reasons set forth above with respect to the term "central database."  InSite One attempts to

support its proposed construction of "institution database" with unsubstantiated conclusions:

> The '742 Patent specification also teaches the structure and function of databases.
> *See id.*, Col. 8: 26-37. Moreover, the term "database" is well-known to those of
> ordinary skill in the art.  (InSite One Br. at p. 16).

There is no teaching of the "structure and function" of "databases" in the '742 Patent.  Column 8

of the '742 Patent makes no reference to an "institution database."  As noted above, the

Applicants define "central database" in column 8 as a physical storage device.  Since the '742

Patent defines "central database" as a storage device (as shown above), it should be presumed

that the "institution database" is also a storage device.

This Court is not limited to considering just the language of claims 1 and 42 "because

other claims of the patent in question, both asserted and unasserted, are valuable sources of

enlightenment as to the meaning of a claim term." *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359,

1366 (Fed. Cir.), *cert. denied*, 128 S.Ct. 618 (2007).  The Federal Circuit

> . . . appl[ies] a presumption that the same terms appearing in different portions of
> the claims should be given the same meaning unless it is clear from the
> specification and prosecution history that the terms have different meanings at
> different portions of the claims.

*PODS*, 484 F.3d at 1366 (internal quotation marks and citations omitted).  Claim 11 of the '742

Patent recites that

> the institution database is selected from the group consisting of a Redundant
> Array Of Independent Disks (RAID), optical storage devices, magnetic storage
> devices, electrical storage devices and a combination thereof.

---

[2] i3Archive is not waiving its right to assert invalidity based upon 35 U.S.C. § 112.

(Col. 18:17-21). Since there is a presumption that the same terms appearing in different portions of the claims are given the same meaning, there is a resulting presumption that the "institution database" is a device, as all of the items listed in the group of claim 11 are devices.

i3Archive contends that the "institution database" is the same as the "proxy database," (which is also not mentioned in the specification). A proxy database is only identified in the figures: blocks 102, 103, and 104 of FIG. 7. These blocks list instructions that perform the specified act shown in each respective block. For example, block 102 lists "Data Query Request - Search Proxy Database For Query Request." An arrow points from block 102 to RAID storage 48. RAID storage 48 is hardware, a physical device. RAID storage 48 is shown within the proxy server in FIG. 5, and thus is a device that is "accessible directly by the institution server," as set forth in Plaintiffs' proposed construction.

InSite One attempts to divide the term "institution database" into its constituent terms "institution" and "database." It then, once again, relies upon an extrinsic dictionary for a definition of database. InSite One's division of the term "institution database" is not proper as the Applicants themselves used the term's constituent words in a combined, unitary fashion. They attributed their own unique meanings to the combined term in their Detailed Description. InSite One is bound by what the Applicants have written in the '742 Patent. i3Archive highlighted the legal problem in using the extrinsic dictionary definition in this manner above, with respect to InSite One's argument regarding the term "central database." InSite One repeated its mistaken analysis here.

InSite One contends that "institution database" is different than "proxy database" and cites *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) for the proposition that the use of different terms in the claims connotes different meanings. (InSite One Br. p. 17). Generally, i3Archive agrees with this position on claim

construction. In this instance, however, it does not apply. *Power Mosfet Tech., L.L.C. v.*

*Siemens AG, Infineon Tech. Corp.*, 378 F.3d 1396, 1409-1410 (Fed. Cir. 2004) ("While we have

often explained that we presume that there is a difference in meaning and scope when different

words or phrases are used in separate claims, the rule is not inflexible.") (internal quotation

marks and citations omitted); *Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1361 (Fed. Cir.

2003) (". . .the intrinsic evidence indicates that the patentee meant for those two terms [in

different claims] to be interchangeable and to carry the same meaning within the claims.")

InSite One also incorrectly contends that the specification does not limit the healthcare

institution to a single computer server. This issue is addressed below in i3Archive's discussion

of the term "institution server."

InSite One argues that there is no requirement for direct accessibility between the

institution server and the institution database. The prosecution history shows why direct

accessibility is required. In securing allowance of the claims, the Applicants stated, "a major

advantage of having the data and images temporarily stored on the proxy server is it 'provides

the participant institution 14 with an **on-line or immediate archive** of its data and images for a

specified period of time.'" (Ex. 2, ISO00000236)(emphasis added). The Applicants' example of

a patient's x-ray was used in the response, describing the storage on the proxy database as

providing faster access. (Ex. 2, ISO00000236-237) (Ex. 2). This faster access is the result of the

direct accessibility between the institution server and the institution database, consistent with

FIG. 7. The specification specifically describes this as caching the images on the "proxy server's

RAID storage 48." (Col. 15:29-32). RAID storage 48 is the institution database. (*See*

i3Archive's Br. at P.24) (the symbol for RAID storage 48 is the same as that for central database

12).

Finally, page 17 of InSite One's brief has misinterpreted part of i3Archive's proposed construction of "institution database." InSite One states:

> The term "institution database" is also not limited to a storage device that acts as temporary, short-term storage."

i3Archive's proposed construction is:

> A storage device accessible directly by the healthcare institution's single computer server device that acts as a short term, temporary storage device and communications device.

The reference to "short term temporary storage" referred to the "healthcare institution's single computer server device," not to the "institution database."

For all of the above reasons, i3Archive contends that its proposed claim construction is supported by the intrinsic evidence, to the extent that this term can even be properly construed.

### C.   Institution Server

| i3Archive Proposed Construction | InSite One's Proposed Construction |
|---|---|
| A healthcare institution's single computer server device that acts as a short term, temporary storage device and communications device and maintains and operates central database | A healthcare institution's computer, program or set of programs that responds to commands or instructions that are received from a healthcare institution. |

"Institution server" is another significant term that is absent from the Detailed Description, except for a minor reference towards the end of the Detailed Description. (Col. 16:33-36).

Like the previous term, InSite One argues that the unitary term "institution server" should be broken in two, in order to define it. Then, they again propose to improperly define one of the terms using a dictionary (extrinsic evidence) to broaden its definition, contrary to *Phillips*, as discussed above. As it has done regarding all of i3Archive's proposed constructions, InSite One incorrectly contends that i3Archive is improperly reading terms from the specification into the claims, while at the same time taking some of its own proposed constructions directly from the

13

Detailed Description portion of the specification and improperly taking other parts of its proposed construction directly from extrinsic dictionary definitions. Using extrinsic dictionary definitions in a primary manner, which was rejected in *Phillips*, impermissibly expands the claims beyond any use or explanation described in the specification. i3Archive fully supported its proposed construction of this term with the Detailed Description of the specification, to the extent possible, even though it is barely mentioned in the '742 Patent.

Claim 1 introduces "an" institution server, specifying that it is a single computer server device by the use of the term "an." Claim 42 recites "a plurality of institution servers" (*see, e.g.,* Col. 20:29) which would properly be construed to be "a plurality of single computer server devices…" under i3Archive's proposed construction. In addition, claim 65 recites the phrase "at least one" several times (*see, e.g.,* Col. 22:58, 61, 63), showing that the Applicants knew the difference between a recitation of "an" item and "at least one" item, the first being the singular form and the second inviting the possibility of more than one.

InSite One contends that "[i]ndependent claims 1 and 42 recite a system comprising one or more institution servers." (InSite One Br. at p. 18). It also contends that "[t]his limitation to a single server in a healthcare institution is not included in the claims." (InSite One Br. at p. 19). InSite One is wrong.

Sometimes, the claims themselves support a claim construction and are instructive in this regard.

> Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms.
>
> To begin with, the context in which a term is used in the asserted claim can be highly instructive. . .Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the

same term in other claims.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.

*Phillips*, 415 F.3d at 1314 (internal quotation marks and citations omitted).

Although the "indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising," it has "a singular interpretation. . .when the patentee evinces a clear intent to so limit the article." *Scanner Tech. Corp. v. ICOS Vision Sys. Corp. N.V.*, 365 F.3d 1299, 1304 (Fed. Cir. 2004).  The Federal Circuit in *AbTox Inc. v. Exitron Corp.*, explains when the patent evinces such a clear intent.  122 F.3d 1019 (Fed. Cir. 1997), *modified on other grounds*, 131 F.3d 1009 (Fed. Cir. 1997).  In *AbTox*, the Court held that the article "a" in the term "a metallic gas-confining chamber" suggested a single chamber for two reasons:  (1) the claim repeatedly referred to "said chamber" which, it held, "reinforces the singular nature of the chamber;" and (2) "[t]he written description supplie[d] additional context for understanding whether the claim language limit[ed] the patent scope to a single unitary chamber." 122 F.3d at 1024.

In the present case, the claims themselves distinguish between "an institution server" and situations where the patentees clearly wanted to recite more than a single institution server.  For example, claim 1 not only recites "an institution server" (Col. 16:60), it also recites "*said* institution server" multiple times, referring back to the *single* institution server previously introduced in the claim.  (*see, e.g.*, Col. 16:62-63, 64; Col. 17:1, 3, 14).  Claim 42 recites "a plurality of institution servers" thereby referring to multiple *single* institution servers (*see, e.g.*, Col. 20:29).  In addition, in the only instance where the Detailed Description specifically refers to an "institution server," it refers only to a *single* institution server:

> For example, an X-ray of Mr. Doe is moved from a participated institution to **the** institution server.  (Col. 16:33-34) (emphasis added)

Accordingly, both the claims and the specification fully support i3Archive's definition of "institution server" as a "single computer server device."  Where the Applicants meant multiple single institution servers, they expressly specified a plurality of institution servers.  *See* claim 42, (Col. 20:29).

The '742 Patent makes clear that the "institution server" is a device; not a program or a set of programs as argued by InSite One.  (Col. 7:62-63) ("The proxy server **is a computer server device**…").  This is consistent with the example given for a proxy server as typically a rack mounted server.  (Col. 8:9-20).  In addition, the significance of the Applicants' use of the word "is" has been discussed above.  The prosecution history is fully in line with i3Archive's proposed construction.  (i3Archive Br. at 23).  InSite One's proposed construction  provides no support from the specification for its position that the recited "institution server" can be a program or a set of programs.

InSite One argues that the specification supports its proposed construction that "institution server" is not limited to a "device":

> nothing in the claims or the specification limits the institution server to a "server device," i.e., hardware but not software. . .The specification supports the breadth of this meaning of server, specifically stating "proxy servers 32 are *typically* rack mounted servers. . .Thus, the inventors envisioned other types of servers; rack mounted servers are simply one embodiment of the institution server.

(InSite One Br. at p. 19-20) (emphasis in original).  InSite One's argument fails.

The '742 Patent Applicants knew the difference between software and hardware.  In one of the few references to software in the '742 Patent, the patent states that the proxy server "includes application software written in C or C++, or other languages, for maintaining and operating central database 12…" (Col. 8:4-6).  It follows this statement with a description of the typical proxy servers being "rack mounted servers," which are devices.  (Col. 8:9-10).  The clear

intention of the '742 Patent is that the "institution server" is a physical device, not a piece of software.

Relying on *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006). InSite One next contends that "i3Archive's proposed construction lacks any 'hooks' from the claims or the specification showing that the term 'institution server' must be limited to a device that maintains and operates the central database." (InSite One Br. at p. 20). InSite One is wrong. The '742 Patent could not be more clear when it recited that "

- "...*each proxy server includes* application software written in C or C++, or other languages, for maintaining and operating central database 12..." (Col. 8:4-6) (emphasis added).

It did not say "may includes," "can include," or even "some embodiments may include." It said that *each* proxy server includes. This is a big enough hook to support i3Archive's proposed claim construction.

InSite One also contends that the specification and claims do not require the institution server to provide short-term, temporary storage. (InSite One Br. at p. 20). InSite One is again wrong. As set forth in i3Archive's opening brief, both the specification and the file history require these attributes for the institution server. When arguing to the Patent Examiner for allowance, the Applicants emphasized the temporary and short term nature of the storage, referring to the Detailed Description. (Ex. 2, ISO00000236) ("the specification discloses that the period of temporary storage...") (i3Archive Br. at p. 18-19).

Accordingly, i3Archive contends that the "institution server" is properly construed as set forth by i3Archive.

### D.    Proxy Database

| i3Archive's Proposed Construction | InSite One's Proposed Construction |
|---|---|
| A storage device accessible directly by the healthcare institution's single computer server device that acts as a short term, temporary storage device and communications device. | A database that contains records and a set of operations for searching the records or other functions that acts as an intermediary between the central database and the healthcare institution's network. |

"Proxy database" is another term that is not found anywhere in the Detailed Description, appearing only in three places in FIG. 7.  i3Archive contends that this term refers to the same device as the "institution database" (similar to "institution server" and "proxy server" being the same) and thus, incorporates its arguments regarding "institution database."  InSite One also continues to improperly break the claim term into two components, "proxy" and "database," and then improperly interprets the claim term using an extrinsic dictionary.  i3Archive explained above why breaking a unitary claim term into its constituent parts is improper.

The problem with breaking the term into parts and using an extrinsic dictionary to separately interpret each part is highlighted by the computer dictionary that InSite One references, as well as the earlier 1997 version of the same dictionary referenced by i3Archive.  In the 1997 version, the definition for "proxy" says *"See* proxy server."  *Computer Dictionary*, (Microsoft Press, 3rd Ed. 1997) (Ex. 7 at p. 387).[3]  That is, the definition of "proxy" in 1997 was deemed to be the same as the definition of "proxy server."  The 1999 version relied upon by InSite One, however, (InSite One Tab H), provides a specific definition for "proxy" in addition to a reference to "proxy server."  The different treatment of "proxy" in these two dictionaries, published by the same publisher only two years apart, highlights the problem with dictionaries noted by *Phillips*

> there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question.  In the course of litigation, each party will naturally choose the pieces of

---

[3] Exhibit 7 is attached to the Declaration of Stanley Weinberg filed concurrently herewith.

> extrinsic evidence most favorable to its cause, leaving the court with the
> considerable task of filtering the useful extrinsic evidence from the fluff.

*Phillips*, 415 F.3d at 1318.

In the present case, InSite One has chosen to rely on a 1999 version of a dictionary rather than the 1997 version of the same dictionary because the 1997 version does not support its proposed construction. That is exactly why this Court should reject InSite One's proposal to break the term "proxy database" into its constituent parts and to use an extrinsic dictionary (in fact, only a specific version of the dictionary) to construe each constituent part.

Finally, with respect to Insite One's argument that the proxy database "can include both hardware and software," (InSite One Br. at p.22), the specification does not support this, nor does InSite One's opening brief.

Accordingly, i3Archive contends that the term "proxy database" is properly construed as set forth by i3Archive.

### E.   Warehouse Database

| i3Archive's Proposed Construction | InSite One's Proposed Construction |
|---|---|
| A storage device located in the central server that is accessible by the warehouse server | A database that contains records and a set of operations for storing the records, searching the records, transmitting the records if asked, or other functions and can provide short or long term storage of the information received from one or more institution servers. |

Like most of the previous claim terms, "warehouse database" does not appear in the Detailed Description. This claim term only appears in the claims 26 and 65.

The best definition that can be derived for this term is that the warehouse database is another *device*, that in this case is accessible by the warehouse server. This is consistent with the other "database" references in the Detailed Description and the claims. It may be that RAID

19

storage 54 contained *in* warehouse server 37 is meant to be the "warehouse database." (*See* Col. 10:28-29, 12:33, 46). This is conjecture, because the Detailed Description is anything but clear.

InSite One argues that the specification discloses embodiments in which the warehouse server is associated with a database that it can access to store information, citing "*id.*" and FIGs. 2, 4, 5. InSite One's construction of this term would not be readily understood by a person of ordinary skill in the art because of the unique way that the '742 Patent defines its "databases." It is also unclear to what the "*id.*" is referring in InSite One's opening brief, as the first citation in this section of InSite One's opening brief is also "*id.*" FIGs. 2 and 4 have no reference to a warehouse database; nor do the corresponding sections of the Detailed Description. FIG. 5 only has the cryptic "Warehouse Server/Database" at the bottom of warehouse server 37.

Claim 26 may provide insight into how this claim term should be interpreted. Warehouse database is recited in claim 26 for the first time as something included in the "central server." (*See* Claim 26, Col. 19:17-20). Claim 65 refers to the warehouse database as "accessible by the warehouse server." In an effort to construe "warehouse database," i3Archive chose the latter because it has an express definition. The problem here is the lack of a clarity in the '742 Patent. To be consistent with the other "database" terms, the "warehouse database" is a hardware device. In claim 26 it is located within the central server. This is consistent with it being "accessible by the warehouse server." It would not render either claim 26 or claim 65 "superfluous."

Accordingly, i3Archive contends that the "warehouse database" can not be construed. To the extent that it can, i3Archive is modifying its earlier proposed construction to properly construe it as "A storage device located in the central server that is accessible by the warehouse server."

### F.   Warehouse Server

| i3Archive's Proposed Construction | InSite One's Proposed Construction |
|---|---|
| A single computer server located at a location remote from the healthcare institution (as defined in Ref. No. 1 above), that acts as a temporary storage device and communications device and connected directly to an institution server (as defined in Ref. No. 1 above) over a communication link. | A computer, program or set of programs that responds to commands or instructions that are received from one or more institution servers and can provide temporary or long term storage of the information. |

i3Archive disagrees with InSite One's proposed claim construction for the reasons set forth above, particularly as set forth with respect to the construction for "institution server." InSite One is attempting to impermissibly broaden the scope of its claims well beyond anything contemplated in the '742 Patent.  There is simply no basis to define the "warehouse sever" to be a program or set of programs.  It is a physical device for the reasons set forth in i3Archive's opening brief and as explained above.

InSite One is also reading a definition for a "server" into its proposed construction from an extrinsic dictionary contrary to *Phillips* in order to attack i3Archive's proposed claim construction.

i3Archive will agree to remove the limitation "directly" from its proposed claim construction.

Accordingly, i3Archive contends that the "warehouse server" is properly construed by its proposed construction, with the word "directly" deleted.

## V.   TERMS INSITE ONE DID NOT DEFINE

For the claim terms that InSite One did not previously identify as requiring construction or for which it did not provide advanced proposed claim constructions prior to filing claim construction briefs, i3Archive contends that InSite One is barred from doing so and filed a

motion to that effect on January 4, 2008.  Accordingly, i3Archive requests that its proposed claim constructions for these terms be adopted by the Court.

## VI.    CONCLUSION

In view of the foregoing and i3Archive's opening claim construction brief, i3Archive requests that the Court adopt the claim constructions proposed by i3Archive and not adopt the claim constructions proposed by InSite One.

Respectfully submitted,

RatnerPrestia

Dated: *February 8, 2008*

By: _____
Benjamin E. Leace (I.D. No. 54281)
Stanley Weinberg (I.D. No. 09853)
1235 Westlakes Drive
Suite 301
Berwyn, Pennsylvania 19312
Telephone: (610) 407-0700
Fax:  (610) 407-0701

Attorneys for Plaintiffs, i3Archive, Inc. and
National Digital Medical Archive, Inc.

243577

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the documents identified below have been filed via ECF and served on February 8, 2008 via the methods stated below:

Date of Service:                    February 8, 2008

Title of Documents:                 Plaintiffs' Responsive Claim Construction Brief;

                                    Declaration of Stanley Weinberg, Esq. with Exhibit

Name of Party Served:               Leslie E. John, Esq.
                                    Ballard Spahr Andrews & Ingersoll, LLP
                                    1735 Market Street, 51st Floor
                                    Philadelphia, PA  19103
                                    *Via First Class Mail*

                                    Paul B. Keller, Esq.
                                    Wilmer Cutler Pickering Hale & Dorr, LLP
                                    399 Park Avenue
                                    New York, NY  10022
                                    *Via First Class Mail*

                                    Mark G. Matuschak, Esq.
                                    Wilmer Cutler Pickering Hale & Dorr, LLP
                                    60 State Street
                                    Boston, MA  02109
                                    *Via First Class Mail*


                                    Counsel for Defendant, InSite One, Inc.


                                    Ann Cadwalader

251207